UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENGINEERED COMFORT
SYSTEMS, INC.,
*A MICHIGAN CORPORATION*

Plaintiff,

v.

THEODORE BORREGO, *AN INDIVIDUAL;*
VERONICA PAZ-BORREGO, *AN INDIVIDUAL.*
ASAP AIR MECHANICAL TEAM, INC., *A FLORIDA CORPORATION.*

Defendants.

Case No. 24-cv-10924

U.S. DISTRICT COURT JUDGE
GERSHWIN A. DRAIN

_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [ECF NO. 19]

### I.    Introduction

On April 10, 2024, Engineered Comfort systems, Inc. ("Plaintiff" or "ECS") commenced the instant action. The complaint alleges violations of the Employment Agreement ECS had with Theodore Borrego ("Borrego"). Though Theodore was the only Defendant employed by ECS, the complaint also alleges claims against Theodore's wife, Veronica Paz-Borrego ("Paz-Borrego"), and a corporation they allegedly formed named ASAP Air Mechanical Team, Inc. ("ASAP"). ECS brings claims for monetary damages and injunctive relief for "Defendants' independent,

1

collective and/or concerted (a) breach of and/or tortious interference with certain restrictive employment agreements (e.g., non-competition agreements) between ECS and its employees; (b) tortious interference with, and usurpation of ECS's contractual and business relationships with its clients; (c) embezzlement and/or theft; (d) violations of the Lanham Act; and (e) various forms of fraud." ECF No. 1, PageID.2.

Before the Court is ECS's Motion for Temporary Restraining Order and Preliminary Injunction. [ECF No. 19]. Defendants responded on August 1, 2024, and Plaintiff replied on August 5, 2024. The Motion is fully briefed. The Court entered a Temporary Restraining Order on July 29, 2024, and held preliminary injunction hearings on August 9, 2024 and September 4, 2024. For the reasons set forth below, ECS's motion is **GRANTED**.

## II.   Factual Background

ECS is a commercial heating, ventilation, and air conditioning ("HVAC") contractor that provides sales, installation and maintenance services to private businesses, educational institutions, condominium associations, and homeowners. *See* ECF No. 19, PageID.151. ECS has its headquarters in Michigan but also operates in South Florida. It hired Borrego as its "New Business Development Director" in July 2011 and he worked in that position until October 2023. Among other things, Borrego was responsible for "generating new and reoccurring business

2

opportunities from ECS's new and existing clients." ECF No. 19, PageID.151. Borrego also had "direct access to and communications with ECS's existing clients, as well as direct access to ECS's confidential and proprietary information, including without limitation, ECS's competitive pricing data, and various supplier and client contacts that had been cultivated by ECS over a period of 12-plus years." *Id*. Borrego was allegedly the primary point of contact for clients with respect to developing relationships, quoting, pricing, and scheduling. *See id*.

Upon his hiring, Borrego executed an Employment Agreement, which included non-competition, non-solicitation, and non-disclosure provisions (the "Restrictive Covenants"). *See* ECF No. 1-1, § § 3-6.

**(1) The Employment Agreement**

The "Noncompetition" provision of the Employment Agreement contains a forum selection clause for Michigan. The agreement prohibits Borrego from directly or indirectly calling upon, soliciting, or selling or attempting to sell services to ECS's customers, either individually or on behalf of another business. *Id*., § 4. The provision remains effective through the duration of Borrego's employment and two years after his termination. *Id*. Specifically, § 4 provides:

> 4. Noncompetition: a) In consideration for (his/her) employment, between the date of signing this Agreement and the date of Employee's [i.e., Borrego] termination, and subject to termination as set forth in Section 2 above, Employee agrees that, during the period of (his/her) employment with Corporation [i.e., ECS] and for a period of two (2) years after (his/her) employment with Corporation terminates, whether

such termination is voluntary or involuntary, (he/she) shall not directly or indirectly, either individually or on behalf of another person or firm

(i)   Call upon, solicit, or sell or attempt to sell any products or services similar to or in competition with those offered by Corporation to any person or firm that (1) was a customer of Corporation during the two (2) year period immediately preceding termination of Employee's employment with Corporation, or that (2) was solicited by Corporation or otherwise had any contact with Corporation during the two (2) year period preceding the termination of Employee's employment with Corporation. Notwithstanding the foregoing sentence, Employee shall not be deemed to be in violation of this section if (he/she) bids or attempts to bid upon work in connection with a project which is publicly advertised by the owner for competitive bids.

*Id.*, at § 4(a)(i). The parties agreed that these restrictions were "fair and reasonable in all respects, including the length of time that they shall remain in effect . . . ." *Id.*, at § 4(b). Additionally, the agreement states that "[i]f any provisions of this Section are ever held by a court to be unreasonable . . . this Section shall be enforced to the extent it is deemed to be reasonable." *Id.*, at § 4(c).

The Restrictive Covenants also prohibit Borrego from soliciting ECS employees to leave ECS: 5. "No Interference with Employment Relations: Employee agrees that (he/she) will not, either before or after termination of (his/her) employment with Corporation encourage, solicit, or otherwise attempt to persuade any other employee of Corporation to leave the employ of Corporation." *Id.*, at § 5. Moreover, the Restrictive Covenants provide that Borrego "shall not communicate or disclose, directly or indirectly, to any person or firm, or use at any time, any of

4

[ECS's] proprietary information, whether or not such information was developed or obtained by Employee." *Id*., at § 3(b).

Under the Employment Agreement, "proprietary information" refers to "the identity of customers and prospective customers of [ECS]; customer files and detailed information concerning customer needs and requirements; proposals designed to meet customer needs or requirements; product designs, drawings, and specifications, or their drafts; formulas, product planning information, market surveys and forecasts; pricing, cost, and margin information; and other financial information and records of Corporation." *Id*., at § 3(a). The agreement acknowledges that the foregoing types of proprietary information are highly confidential to Corporation, are valuable, give a competitive advantage to Corporation, and could not, without great expense and difficulty, be obtained or duplicated by others who have not been able to acquire such information by virtue of employment with Corporation. *Id*., at § 3(a). Borrego agreed to return all "proprietary information" to ECS upon the termination of his employment. *Id*., at § 6. The agreement further acknowledged that "[ECS] would be irreparably harmed, damages would be difficult to establish, and [ECS] would not have an adequate remedy at law if [Borrego] were to breach this Agreement." *Id*., at § 7.

Therefore, the Employment Agreement expressly authorizes various remedies for violations of the Restrictive Covenants, including:

(a) an injunction restraining Employee from disclosing or using any proprietary information of Corporation in breach of Section 3 and liquidated damages of $10,000.00 for each violation or breach of Section 3;

(b) an injunction restraining Employee from engaging in a competitive business in breach of Section 4(i) and liquidated damages of $500.00 for each day in which Employee is found to have been in breach of Section 4(i);

(c) . . . an injunction restraining Employee from breaching Section 5 and liquidated damages of $1,000.00 for each employee of Corporation which Employee encourages, solicits, attempts to persuade or persuades to leave the employ of Corporation;

(d) an injunction or other order requiring Employee to return Proprietary Information to the Corporation and liquidated damages of $500.00 per day that Employee retains proprietary information in breach of Section 6.

*Id.*, at§ 7 (line breaks added). Finally, ECS and Borrego agreed that ECS "shall also be entitled to the award of its costs and its actual attorney fees incurred in enforcing this Agreement." *Id*.

### (2) Factual Detail Regarding the Alleged Breach of the Employment Agreement

In July 2018, while Borrego was still employed by ECS, ASAP filed Articles of Incorporation in Florida. ASAP was incorporated by an individual named "Maria Veronica Montesinos." Plaintiff asserts that Montesinos is an assumed name used by Borrego's wife, Paz-Borrego. Accordingly, Plaintiff believes that ASAP was incorporated by Paz-Borrego, who was allegedly living with Borrego in Florida at the time he was still employed by ECS. Because ASAP advertises to customers that

6

it offers "commercial and residential HVAC services[,]" Plaintiff believes that ASAP's services are "directly competitive with ECS's services." ECF No. 19, PageID.156.

ECS also alleges that, beginning in early 2022, Borrego began quoting services to Atlantic III Condominium Association in Aventura Florida ("Atlantic III"). Plaintiff says that "Atlantic III is a longtime client of ECS." *Id*., at PageID.157. As alleged, in an email dated April 14, 2022, Paz-Borrego sent a quote to Atlantic III on behalf of ASAP for services described as "WSHP Unit Replacemenmt [sic] and New Ductwork." *Id*. ASAP apparently performed these services and billed Atlantic III for them in August 2022. *Id*. ASAP continued to quote and bill Atlantic III for services throughout 2022 and 2023. *Id*. This included at least one major project worth over $50,000. Notably, "Ted Borrego" was copied on an email dated June 6, 2023. *Id*.

ECS says that, in a conversation with Atlantic III, it learned that ASAP "had represented that it was affiliated with ECS, that ECS was being sold, or that ECS was no longer a concern." *Id*., at PageID.159. Upon learning of its misapprehension, Atlantic III allegedly provided ECS with the various emails with ASAP that are attached to this brief (along with many others) showing that Borrego, Paz-Borrego, and ASAP repeatedly solicited and provided services to Atlantic III. *Id*.

Additionally, ECS says that it also learned that Borrego and/or Paz-Borrego solicited and performed HVAC services and installations for the following ECS customers on behalf of ASAP:

    a. Colonnades Condominiums;

    b. Jones Lang Lasalle at various Truist Bank buildings;

    c. 2600 Island Blvd Condos;

    d. Fendi Château Residences;

    e. Cristelle Condominiums; and

    f. Eloquence on the Bay Condominiums.

*Id*. Borrego and/or Paz-Borrego also allegedly solicited at least three of ECS's employees to work for ASAP and/or its affiliates, including Oscar Rodriguez, Jorge Pezoa and Maury Tarrago. *Id*. Finally, Plaintiff alleges that, "at least one of these employees, Oscar Rodriguez, is subject to a Confidentiality and Non-Competition Agreement that is substantially similar to Borrego's Employment Agreement." *Id*.

ECS believes that Defendants "are soliciting and/or providing services to other clients of ECS." *Id*. "As a result of ASAP's diversion of ECS's business[,]" Plaintiff says, "certain ECS personnel have stood idle while ECS continued to pay their wages and benefits so they could support their families." *Id*. As alleged, the damages include "the loss of goodwill, damage to ECS's client and employment relationships, and loss of future business opportunities." *Id*., at PageID.161.

8

Accordingly, ECS moves for injunction relief. The Court will discuss the applicable law and analysis below.

### III.   Legal Standard

In evaluating a motion for preliminary injunction, the court considers four factors: (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. S. *Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co*., 860 F.3d 844, 849 (6th Cir. 2017). Because preliminary injunctions necessarily happen before the parties have had an opportunity to fully develop the record, the movant "is not required to prove his case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp*., 511 F.3d 535, 542 (6th Cir. 2007).

However, "[a] preliminary injunction is an extraordinary and drastic remedy" that "should not be granted lightly." *Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (internal quotation marks omitted). Indeed, the Supreme Court has held that a preliminary injunction should "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). And the Sixth

Circuit has cautioned "that [the preliminary injunction factors are] to be balanced, not prerequisites to be met." *Certified Restoration*, 511 F.3d at 542. It is well established, however, that "'a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed[.]'" *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir.2010) (*quoting Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir.1997)). However, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (citation omitted).

## II. Analysis

As a reminder, Plaintiff demands injunctive relief for "Defendants' independent, collective and/or concerted (a) breach of and/or tortious interference with certain restrictive employment agreements (e.g., non-competition agreements) between ECS and its employees; (b) tortious interference with, and usurpation of ECS's contractual and business relationships with its clients; (c) embezzlement and/or theft; (d) violations of the Lanham Act; and (e) various forms of fraud." ECF No. 1, PageID.2.

The Court finds that ECS has demonstrated a strong likelihood of success on the merits. As argued, Defendants acknowledge that Borrego is party to a contract

10

with ECS that prohibits, inter alia, soliciting or servicing ECS's customers and attempting to hire ECS's employees. ECF No. 22, PageID.261. Defendants also freely admit to servicing at least two of ECS's customers, *id.*, PageID.262, do not dispute attempting to hire ECS's employees, *see id.*, PageID.263, and acknowledge that Borrego "obtained . . . the identity of [ECS's] clients" through his employment with ECS, *id.*, PageID.267. Notably, Defendants acknowledge that Paz-Borrego formed ASAP for the purpose of subverting Borrego's non-competition obligations (or as Defendants euphemize it, facilitating Borrego's attempt to "explore working independently"). *Id.*, at PageID.266.

Defendants advance several arguments in response. First, Defendants say the Employment Agreement is geographically overbroad because it has no facial geographic limitation. A non-compete agreement is reasonable in scope if it mirrors the territory of an employer's business. *See Superior Consulting Co. v. Walling*, 851 F. Supp. 839, 847 (E.D. Mich. 1994) (noting that a non-compete with no geographic limitations "can be reasonable if the employer actually has legitimate business interests throughout the world"). The Restrictive Covenants are enforceable if they (i) protect a reasonable competitive interest, and (ii) are reasonable in duration, geographical area, and line of business. Mich. Comp. Laws § 445.774a.

The Employment Agreement is narrowly tailored in its effect because it prohibits Borrego from servicing or soliciting ECS's actual or prospective customers

and recruiting its employees—who would be located in the Michigan and Florida markets that ECS services. *See* ECF No. 19-2, ¶4. The Employment Agreement tracks the geographic territory in which ECS operates. *See id*. To the extent that the agreement is facially overbroad, the Court will "limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited." Mich. Comp. Laws § 445.774a(1). The scope of the agreement is limited to the states in which ECS operates—Michigan and Florida.

Second, Defendants assert that the agreement unreasonably restrains Borrego from relying on his "generalized knowledge and skill" and does not protect any proprietary information. ECF No. 22, PageID.266-67. However, an employer has a "reasonable business interest . . . in restricting its former employees from enticing away the employer's old customers." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 548 (6th Cir. 2007) (cleaned up). And "confidential information, including information regarding customers, constitutes property of the employer and may be protected by contract." *Follmer, Rudzewicz & Co., P.C. v. Kosco*, 420 Mich. 394, 402–03 (1984) (emphasis added).

Third, Defendants claim that Borrego did not breach the Employment Agreement because each of ECS's customers "came to Defendants of their own volition." ECF No. 22, PageID.262. The Employment Agreement prohibits Borrego from soliciting or servicing ECS's customers, and Defendants admit that they

12

serviced at least two of ECS's customers. *Id*. Whether Borrego or the customers first initiated contact; either way Plaintiff demonstrates that Borrego likely violated the Employment Agreement with Defendants' assistance.

Fourth, Defendants argue that ECS will not suffer irreparable harm, and the request for injunctive relief is moot, because ASAP has "ceased its operations." [Id. at PageID.268.] However, Defendants clarify in a footnote that they only "intend" to dissolve ASAP but have not taken the proper steps to do so. *Id*., at PageID.263. Regardless, "[a] party's voluntary cessation of an allegedly illegal activity does not moot the issue of whether prospective injunctive or declaratory relief is proper." *Dixie Fuel Co. v. Comm'r of Soc. Sec*., 171 F.3d 1052, 1056 (6th Cir. 1999). The undisputed facts show that Borrego breached the Employment Agreement, and Paz-Borrego helped him do it by forming ASAP.

Fifth, Defendants argue that the Court should not enforce the Employment Agreement as written because it would cause an "undue hardship" to Borrego and harm the public interest in free competition. ECF No. 22, PageID.269-70. But even if enforcing restrictive covenants as written may result in hardship to employees, refusing to enforce valid agreements "would create an incentive for other [employees] to violate their agreements without fear of reprisal." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764, 780 (E.D. Mich. 1999). Borrego agreed to the terms of the Employment Agreement, and it is not unjust for

the Court to enforce those terms. Similarly, the Sixth Circuit has rejected the view that the reduction in competition imposed by an injunction against one business should prevent courts from entering injunctions. ECF No. 19, PageID.171-72 (*quoting Certified Restoration Dry Cleaning Network*, 511 F.3d at 551). It is neither unduly burdensome, nor against the public interest, to enforce the Employment Agreement as written.

## IV.  Conclusion

The Court will **GRANT** Plaintiff's Motion for Preliminary Injunction. The Terms of the injunction will follow this Opinion.

**SO ORDERED.**

Dated:  September 5, 2024                    /s/Gershwin A. Drain_____
                                            GERSHWIN A. DRAIN
                                            United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 5, 2024, by electronic and/or ordinary mail.
/s/ Marlena Williams
Deputy Clerk

14